**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

| | | |
|---|---|---|
| **ROBIN MICHELLE MEADOWS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:14-28563** |
| | ) | |
| **CAROLYN W. COLVIN ,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. By Standing Orders entered November 19, 2014, and January 5, 2016 (Document Nos. 4 and 22.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). This case presently is pending before the Court on the parties cross-Motions for Judgment on the Pleadings. (Document Nos. 18 and 21.)

The Plaintiff, Robin Michelle Meadows, (hereinafter referred to as "Claimant"), filed an application for SSI on July 1, 2010 (protective filing date), alleging disability as of April 20, 1999, due to obsessive compulsive disorder, chronic kidney problems with severe pain, bipolar, memory loss, panic disorder, anxiety, and learning disability. (Tr. at 14, 225-26, 227-31, 270, 274.) The claim was denied initially and upon reconsideration. (Tr. at 64-65, 66-68, 71-73, 81-83.) On June 9, 2011, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 84.) A hearing was held on July 11, 2012, before the Honorable Robert S. Habermann. (Tr. at 33-57.) Supplemental hearings were held on January 8, 2013, and July 9, 2013. (Tr. at 58-62 and Document

No. 17.) By decision dated July 18, 2013, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 14-24.) The ALJ's decision became the final decision of the Commissioner on September 22, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) Claimant filed the present action seeking judicial review of the administrative decision on November 18, 2014, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2013). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful

activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2013). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C

of the Listings of Impairments.

> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1). [1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

4

claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since July 1, 2010, the application date. (Tr. at 16, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant suffered from "borderline intellectual functioning; depression; anxiety disorder; bipolar disorder; and history of substance abuse," which were severe impairments. (Tr. at 16, Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 17, Finding No. 3.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform work at all exertional levels, as follows:

> [T]he [C]laimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the [C]laimant is limited to simple 1-2 step, repetitive tasks in a low stress work environment with no strict demand/quotas for production. The [C]laimant can occasionally have contact with co-workers and supervisors, but no contact with crowds or the general public.

(Tr. at 19, Finding No. 4.) At step four, the ALJ found that Claimant had no past relevant work.

5

(Tr. at 22, Finding No. 5.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a laundry worker, textile presser, and production inspector, at the unskilled level. (Tr. at 22-23, Finding No. 9.) On this basis, benefits were denied. (Tr. at 23, Finding No. 10.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was born on August 5, 1980, and was 32 years old at the time of the initial administrative hearing, July 11, 2012. (Tr. at 22, 39, 227.) Claimant had a seventh grade, or limited education and was able to communicate in English. (Tr. at 22, 40, 273, 275.) Claimant's past work did not constitute substantial gainful activity. (Tr. at 22, 54, 274.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence of record, and will discuss it below as it relates to the undersigned's findings and recommendation.

*Physical Impairment (Kidney-Related)*:

The record reflects Claimant's treatment at Greenbrier Valley Medical Center from February 11, 2005, through December 15, 2012, and at Greenbrier Valley Urology Associates from June 11, 2007, through April 14, 2013, for chronic pelvic pain syndrome, renal calculus disease, possible interstitial cystitis/endometriosis, kidney and uretal stones, hemorrhagic ovarian cyst, chronic pyelonephritis, and urinary tract infections. (Tr. at 359, 360-77, 378-79, 754-883, 1054-1226, 1252-65, 1266-1306.) Claimant was compliant with treatment and reported pain, urgency, and frequent on urination and radiographic evidence demonstrated recurrent obstructing calculi. (Id.)

On September 28, 2010, Dr. Gary Craft, M.D., conducted a consultative examination at the request of the State agency. (Tr. at 573-79.) Claimant reported a history of anxiety, depression, bipolar disorder, obsessive compulsive disorder ("OCD"), a learning disability, and recurrent loss of memory. (Tr. at 573.) She also reported a history of cystitis and possible kidney disease, which was accompanied by recurrent, dull, aching pain that was localized to the low back. (Id.) Physical exam revealed that Claimant fully was ambulatory, was free of any acute distress, and had normal range of motion of all extremities, sensation, reflexes, and strength. (Tr. at 574-75.) Dr. Craft noted that Claimant was very well oriented, related well to others, and had intact gross mental status. (Tr. at 575.) He was unable to "detect any overt evidence of mental retardation." (Id.) Dr. Craft opined that Claimant's long-term prognosis for the mental condition was fair. (Id.) He also noted that he was unable to detect any element of renal disease, and that her long-term prognosis for

7

cystitis and low back pain was fair. (Tr. at 575-76.)

Claimant started suboxone therapy with Dr. Hassan Jafary, M.D., at Stanaford Medical Clinic, on April 6, 2010. (Tr. at 598.)

On November 21, 2011, Claimant presented to the emergency department at Bluefield Regional Medical Center with complaints of right flank discomfort for one week, urinary urgency, radiation from the right flank to the abdomen and groin area, a history of kidney stones, and nausea and vomiting. (Tr. at 664-67.) An abdominal and pelvic CT scan revealed no abnormalities in the abdomen or pelvis and multiple tiny non-obstructing calculi in the kidneys, with moderate scarring in the right kidney. (Tr. at 666, 673.) She was diagnosed with a urinary tract infection, and right ureterolithiasis. (Tr. at 666.)

_Mental Impairments_:

On July 7, 2008, Claimant was admitted to Princeton Community Hospital with suicidal ideations and psychosis. (Tr. at 389-95.) Dr. Phillip B. Robertson, M.D., diagnosed, _inter alia_, borderline intellectual functioning based on her eighth grade education. (Tr. at 392.)

Claimant received psychotherapy from Dr. H. A. Jafary, at Beckley Psychiatric Services from April 21, 2010, through October 4, 2010, on referral from the Stanaford Medical Clinic. (Tr. at 580-88.) On April 21, 2010, Claimant reported an eight-year history of substance abuse. (Tr. at 580.) She also reported feelings of irritability, depression, and mood swings. (Id.) Mental status exam was unremarkable. (Tr. at 581.) She reported having panic attacks on May 14 and 26, 2010, and was prescribed Ativan. (Tr. at 583-84.) On June 19, 2010, Claimant reported anxiety and depression, Dr. Jafary noted that she was crying. (Tr. at 585.) Claimant reported a lack of energy and that she slept a lot. (Id.) Mental status exam was normal and Dr. Jafary prescribed Wellbutrin. (Id.) Claimant again reported depression and crying on July 2, 2010 (Tr. at 586.), and stated on

August 3, 2010, that she was "doing okay." (Tr. at 587.) Dr. Jafary noted that Claimant was calm and alert. (Id.) On October 4, 2010, Claimant reported that she was "doing a little better." (Tr. at 588.)

On December 20, 2010, Sunny S. Bell, M.A., a licensed psychologist, performed a consultative evaluation at the request of the State Disability Determination Service. (Tr. at 631-40.) Ms. Bell noted that Claimant quit school after she completed the seventh grade because she was pregnant and wanted to get married. (Tr. at 633.) Claimant stated that she made average grades and was retained in the fourth grade due to poor grades. (Id.) She denied any disciplinary problems and indicated that she did not participate in any extracurricular activities. (Id.) Claimant reported that she worked for one month as a cashier at a department store, where she was reliable and related well with co-workers and supervisors. (Tr. at 634.) Claimant ultimately was terminated from her job because her "cash register kept running over and under." (Id.)

Claimant had a normal mental status exam with the exception of an anxious and depressed mood with a blunted affect, severely deficient recent memory, and moderately deficient concentration. (Tr. at 634-35.) Intellectual assessment revealed a full scale IQ score of 69 and reading, spelling, and math abilities at a third, second, and fifth grade level respectively. (Tr. at 635.) Ms. Bell opined that the results were an accurate estimate of Claimant's true level of functioning and were commensurate with her educational and vocational history. (Id.) Ms. Bell diagnosed bipolar disorder NOS, panic disorder without agoraphobia, obsessive-compulsive disorder, opioid dependence in early full remission, and mild mental retardation. (Id.) The mild mental retardation diagnosis was based on Claimant's test scores, with onset "believed to have been before age 18." (Tr. at 637.) Ms. Bell noted that Claimant exhibited deficits in functional academic skills, self-care skills, and work skills. (Id.) On January 18, 2011, Ms. Bell filed an

addendum to her report wherein she stated that after having reviewed treatment records from Southern Highlands Community Mental Health Center, her diagnoses remained unchanged. (Tr. at 638.)

On January 29, 2011, Dr. Debra Lilly, Ph.D., a State agency reviewing medical consultant, completed a form Mental RFC Assessment, on which she opined that Claimant was moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and interact appropriately with the general public. (Tr. at 641-42.) Dr. Lilly determined that Claimant was not limited significantly in all other functional areas. (Id.) Dr. Lilly noted that none of Claimant's treating source notes supported a finding of mental retardation. (Tr. at 643.) Although Claimant alleged that she was dependent upon her husband, Dr. Lilly noted that the evidence indicated she lived alone and did not mention him as providing support. (Id.) She further noted that overall, treating source records indicated that Claimant consistently related well, had good judgment and insight, and was not mentally retarded. (Id.) Consequently, Dr. Lilly opined that Claimant retained the ability "to learn, recall, and perform simple, unskilled work-like activities in [a] setting that require[d] limited contact with the general public and [did] not have high production demands." (Id.)

Dr. Lilly also completed a form Psychiatric Review Technique, on which she opined that Claimant's borderline intellect, bipolar disorder, panic disorder, and substance addiction disorder, met a Listing, but did not indicate which listing. (Tr. at 646-59.) She noted that Claimant's

10

substance addiction disorder was evaluated under Listings 12.02, 12.04, and 12.06. (Tr. at 654.) She concluded that Claimant's impairments resulted in mild restrictions of daily activities; moderate difficulties in maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. at 656.) On May 3, 2011, Dr. Jeff Boggess, Ph.D., reviewed all the relevant evidence of record and affirmed Dr. Lilly's assessment, as written. (Tr. at 662.)

On March 9, 2012, Claimant initiated treatment with Brandi Huffman, P.A., at Bluestone Health Center, for complaints of depression and panic attacks. (Tr. at 674-75.) She was diagnosed with depression and anxiety disorder NOS and prescribed Prozac 20mg. (Tr. at 675.) Claimant treated at Bluestone Health Center through May 16, 2013, primarily for depression and anxiety. (Tr. at 738-44, 1307-12.) Diagnoses included adjustment disorder with mixed anxiety and depression, anxiety disorder NOS, depression, panic attacks, and suicidal ideations. (Tr. at 740, 743, 1308-09, 1312.)

Claimant also treated at Southern Highlands Community Mental Health from February 2, 2000, through March 12, 2010, for counseling and psychiatric services, regarding her depression and anxiety, at the referral of Tonya McFadden, M.A., a licensed psychologist. (Tr. at 477-572, 1227-41.) On October 2, 2000, Claimant reported that she happily was married and identified her mother as her biggest source of support who helped her to relax and encouraged her to eat. (Tr. at 1230.) On May 21, 2004, Dr. Alina D. Vrinceanu, M.D., a Staff Psychiatrist, estimated on mental status exam, that Claimant's intelligence was average. (Tr. at 483.)

On September 7, 2012, at the request of the ALJ, Dr. Gary Bennett, Ph.D., completed a form Medical Source Statement of Ability to Do Work-Related Activities (Mental), on which he opined that Claimant had mild limitations in her ability to understand, remember, and carry out

simple instructions; moderate limitations in her ability to make judgments on simple work-related decisions, interact appropriately with supervisors and co-workers, and respond appropriately to usual work situations and to changes in a routine setting; and marked limitations in her ability to understand, remember, and carry out complex instructions, make judgments on complex work-related decisions, and interact appropriately with the public. (Tr. at 728-29.) Dr. Bennett further opined that Claimant's concentration was moderately impaired. (Tr. at 729.) He noted that there was evidence of substance abuse as Claimant became dependent on opiates following surgery and completed a Suboxone treatment program. (Id.) He further noted that attempts to have treated Claimant's anxiety and mood disorders would have been compromised by the use of opiates, but otherwise, Dr. Bennett "would not significantly change" his assessed limitations even if the substance abuse were eliminated. (Id.) Dr. Bennett opined that Claimant's mental impairments resulted in moderate limitations in maintaining daily activities, social functioning, concentration, persistence, or pace and one or two mild episodes of decompensation of extended duration. (Tr. at 733.) He noted that Claimant was hospitalized briefly in 2008, for depression. (Id.) Dr. Bennett further opined that none of Claimant's mental impairments met or equaled a Listing level impairment. (Tr. at 734.) He noted that the issue as to whether Claimant was mentally retarded was "a sticky one in this case." (Tr. at 735.) He noted that Ms. Bell's testing revealed a full scale IQ score of 69, which meant that there was a ninety-five percent chance that Claimant's true IQ was somewhere in the range of approximately 65 to 73. (Id.) Ms. Bell diagnosed mild mental retardation based on the IQ score and Claimant's report of special education classes. (Id.) Mr. Bennett noted however, that a prior report indicated that Claimant was in regular classes. (Id.) He stated that other "than Ms. Bell's evaluation, there is little evidence that would support a diagnosis of mental retardation." (Id.) Southern Highland treatment records indicated little concerns of her

12

intellectual functioning, and GAF scores fell generally at 60, which was the upper end of the moderate range of symptom severity or functional impairment. (Id.) In 2004, she was estimated at an average level of intelligence, and when hospitalized in 2008, it was noted that she had borderline intellectual functioning. (Id.) Consequently, Dr. Bennett opined that the evidence did not support a diagnosis of mild mental retardation. (Tr. at 735.)

On January 28, 2013, Dr. Bennett reported that he reviewed the additional evidence and noted that nothing caused him to make any significant changes to his original opinion. (Tr. at 1242-46.)

*Educational Records*:

Claimant's educational records from Summers County High School indicated that Claimant was placed in learning disability classes for reading and language arts for school years 1995 and 1996, for the seventh and eighth grades. (Tr. at 353-55.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in failing to find that she met or equaled Listing 12.05C. (Document No. 18 at 10-15.) Particularly, she alleges that the ALJ erred in failing to find that she had deficits in adaptive functioning. (Id. at 11.) Claimant asserts that the ALJ aptly noted that she took special education classes, dropped out of school after the seventh grade, could read and write very little, and had no past relevant work experience. (Id. at 12.) Additionally, she noted that Ms. Bell diagnosed mild mental retardation and that Claimant was awarded SSI benefits in 1999, only to have the benefits terminated due to an increase in her husband's income. (Id.) Claimant asserts that Dr. Bennett's rejection of Ms. Bell's diagnosis of mild mental retardation was not supported by her educational records and her mother's statements that she took learning disability classes

and required one-on-one instruction. (Id. at 13-14.) Claimant moreover asserts that the Social Security Field Office representative noted that Claimant's husband answered most all the questions for her, and noted that she had difficulty with coherency, concentrating, and answering. (Id. at 14.) Accordingly, Claimant contends that the evidence demonstrated deficits in adaptive functioning. (Id. at 14-15.)

In response, the Commissioner asserts that Claimant's argument lacks merit because substantial evidence supports the ALJ's finding that she did not manifest deficits in adaptive functioning prior to age 22, and therefore, failed to meet Listing 12.05C. (Document No. 21 at 7-11.) The Commissioner notes that although Claimant quit school after the seventh grade, it was because she was pregnant "and not due to problems keeping up with the curriculum." (Id. at 9.) The Commissioner further notes that Claimant received average grades and subsequently took classes to obtain her GED. (Id.) Additionally, school records reflected only special education classes for reading and language arts. (Id.) The Commissioner also noted that Claimant watched her children during the day and was married for over fifteen years. (Id. at 9-10.) Regarding the medical evidence, the Commissioner notes that there was no opinion that Claimant met or equaled a Listing impairment. (Id. at 10.) Only Ms. Bell's evaluation suggested that Claimant was mentally retarded. (Id.) Dr. Craft did not detect any mental retardation and Dr. Lilly opined that Claimant was capable of performing simple, unskilled work. (Id. at 10-11.) Consequently, the Commissioner contends that the ALJ's decision is supported by substantial evidence. (Id. at 11.)

Claimant also alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to find that her bladder disease and kidney problems were severe impairments. (Document No. 18 at 15-16.) She asserts that the ALJ provided only a conclusory statement that her bladder and kidney problems, *inter alia*, were responsive to treatment and

14

caused no more than minimal limitations. (Id.) She asserts that the ALJ failed to discuss any evidence of her impairments, "which documented a long history of interstitial cystitis, chronic pyelonephritis of the right kidney, chronic pelvic pain syndrome, chronic/recurrent renal stones, and cortical scarring of the right kidney. (Id. at 16.) Additionally, Claimant asserts that the ALJ failed to acknowledge her multiple surgeries and reports of urgency, frequency, and pain with urination. (Id.) Claimant therefore, contends that her kidney and bladder conditions were more than a slight abnormality. (Id.)

In response, the Commissioner asserts that the ALJ's decision that Claimant's bladder and kidney problems were non-severe because they were responsive to treatment and caused no more than minimal limitations, is supported by substantial evidence of record. (Document No. 21 at 11-13.) The Commissioner notes that a CT scan in November 2011, revealed only previously-seen cysts and multiple, tiny, non-obstructing kidney stones. (Id. at 12.) Claimant underwent surgery in December 2012, which resolved her kidney stones. (Id.) Moreover, the Commissioner asserts that no treating physician assessed any functional limitations resulting from the kidney and bladder problems. (Id.) The Commissioner also notes that Claimant fails to identify the limitations she experienced as a result of these impairments. (Id. at 12-13.) Consequently, the Commissioner contends that Claimant failed to meet her burden of proving that her kidney and bladder problems were severe impairments. (Id. at 13.)

Analysis.

   1.  Listing § 12.05C.

Claimant first alleges that the ALJ erred in failing to find that she met or equaled Listing 12.05C. (Document No. 18 at 10-15.) The Listing of Impairments describes, for each of the major body systems, impairments that are considered severe enough to prevent an adult from doing any

gainful activity," regardless of age, education or work experience, see Sullivan v. Zebley, 493 U.S. 521, 532, 110 S.Ct. 885, 892, 107 L.Ed.2d 967 (1990); 20 C.F.R § 416.925(a) (2013). Section 12.05 of the Listing of Impairments provides criteria for determining whether an individual is disabled by mental retardation or autism. "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2013). The required level of severity for Listing § 12.05 is satisfied when any one of the four following requirements is satisfied:

> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

OR

> B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR

> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

To meet the criteria of § 12.05C, Claimant must show "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional

and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C

(2013). The Fourth Circuit has held that a claimant's additional "severe" impairment qualifies as

a significant work-related limitation for the purpose of listing § 12.05C. Luckey v. United States

Dep't of Health & Human Serv., 890 F.2d 666 (4th Cir. 1989) (per curiam). A "severe" impairment

is one "which significantly limits [one's] physical or mental ability to do basic work activities."

20 C.F.R. §§ 404.1520(c); 416.920(c) (2013). In Luckey, the Court ruled that:

> Luckey's inability to perform his prior relevant work alone established the
> significant work-related limitation of function requirement of section 12.05C.
> Further, the Secretary has defined a severe impairment or combination of
> impairments as those which significantly limit an individual's physical or mental
> ability to do basic work activities. The Secretary's finding that Luckey suffers from
> a severe combination of impairments also establishes the second prong of section
> 12.05C.

Id. at 669 (internal citations omitted).

As described in the introduction to the Listing, and as stated by the ALJ, one of the essential

features of mental retardation is significant deficits in adaptive functioning. 20 C.F.R. Pt. 404,

Subpt. P, App. 1 § 12.00; See also The Merck Manual of Diagnosis and Therapy 3044 (Mark H.

Beers, M.D. & Robert S. Porter, M.D., eds., 19th ed. 2011) (defining mental retardation, now

referred to as "intellectual disability," as "significantly subaverage intellectual functioning (often

expressed as an intelligent quotient < 70 to 75) combined with limitations of > 2 of the following:

communication, self-direction, social skills, self-care, use of community resources, and

maintenance of personal safety. Management consists of education, family counseling, and social

support).[1] Also, according to the Diagnostic and Statistical Manual of Mental Disorders, 4th

---

[1] "In 1992 the American Medical Association on Mental Retardation changed the definition of
mental retardation to reflect adaptation to the environment and interaction with others by a person
with limited intellectual functioning.   Classification based on IQ alone (mild, 52 to 68; moderate,
36 to 51, severe, 20 to 35; profound, less than 20) has been replaced to that based on level of

Edition, (DSM-IV)(1994), one of the essential features of mental retardation is significant deficits in adaptive functioning. Id. at 39-40. Adaptive functioning refers to how effectively an individual copes with common life demands and how well she meets the standards of personal independence expected of someone in his particular age group, sociocultural background, and community setting. Id. at 40. The Regulations make clear that Listing § 12.05C is a three-part test. The Introduction to section 12.00 of the Listings, section 12.00A, was revised in 2000 to state as follows:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A; 65 Fed. Reg. 50, 746, 50, 776; see also Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001) (detailing change).

In his decision, the ALJ considered Claimant's mental impairments under Listings §§ 12.04, 12.05, and 12.06, and found that she failed to meet or equal any Listing. (Tr. at 17-19.) In considering Listing 12.05C, the ALJ concluded that Claimant failed to meet the Listing because she did not demonstrate the requisite deficits in adaptive functioning prior to the age of 22. (Tr. at 18.) The ALJ found that Claimant met the first two criteria in that she had a valid IQ score of 69 and had the additional mental impairments of depression and anxiety. (Id.) The ALJ acknowledged Claimant's testimony that she completed only the seventh grade in school and could read and write very little. (Tr. at 19.) Nevertheless, the ALJ determined that Claimant's school records failed to reflect any testing that indicated she had mental retardation. (Id.)

---

support needed." *The Merck Manual of Diagnosis and Therapy* 2259 (Mark H. Beers, M.D. & Robert Berkow, M.D., eds., 17th ed. 1999).

The Court finds that the ALJ's finding of a lack of deficits in adaptive functioning prior to the age of 22, is supported by the substantial evidence. Adaptive functioning "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." DSM-IV at 42. The determination of whether Claimant demonstrated deficits in adaptive functioning that manifested prior to the age of 22, required the ALJ to perform a fact-specific inquiry. The ALJ discussed Claimant's educational background in that she completed schooling only through the seventh grade. (Tr. at 19.) As the Commissioner notes, Claimant quit school due to having been pregnant and not due to a mental inability to continue her education. (Tr. at 633.) The ALJ also acknowledged Claimant's testimony that she could read and write very little. (Tr. at 19.) School records corroborate her testimony to the extent that she was placed in learning disabled classes for reading and language arts for her seventh grade school year. (Tr. at 353-55.) Claimant however, participated in regular classes for all other subjects. (Id.)

The ALJ also acknowledged that Claimant's school records did not reflect any testing that suggested she had mental retardation. (Tr. at 19.) The only intellectual functional testing of record was performed by Sunny Bell, who noted a full scale IQ score of 69, and ability to perform spelling, reading, and math at the second, third, and fifth grade levels, respectively. (Tr. at 635.) Based on the test scores, combined with deficits in functional academic skills, self-care skills, and work skills, Ms. Bell determined that Claimant had an onset of mild mental retardation prior to the age of 18. (Tr. at 637.) Notwithstanding a lack of additional intellectual testing, Dr. Craft concluded that none of the evidence suggested that Claimant was mentally retarded. (Tr. at 575.) He was unable to detect any deterioration in Claimant's personal habits. (Id.) Likewise, Dr. Lilly,

after having reviewed all the evidence, concluded that Claimant was able to "learn, recall, and perform simple, unskilled work-like activities," with limited contact with the general public and an absence of high production demands. (Tr. at 643.) She did not find that Claimant was mentally retarded. (Tr. at 641-59.) In 2004, Dr. Vrinceanu assessed on mental status exam that Claimant was of average intelligence. (Tr. at 483.) When Claimant was hospitalized in July 2008, with suicidal ideations and psychosis, Dr. Robertson concluded that she was of borderline intellect, based upon her eighth grade education. (Tr. at 392.) Most prominently however, Dr. Bennett found that beyond Ms. Bell's evaluation, the evidence did not support a diagnosis of mental retardation. (Tr. at 21, 735.) He noted that treatment records from Southern Highlands reflected little concern as to her intellectual functioning and consistently referenced GAF scores that fell in the upper end of the moderate range of symptom impairment. (Id.) He also noted that in 2004 and 2008, Claimant was estimated at an average and borderline level of intellectual functioning, respectively. (Id.)

Despite Ms. Bell's findings and Claimant's testimony that she stayed confused and had difficulty understanding things, the ALJ acknowledged, elsewhere in his decision, that Claimant testified that she had no problems taking care of her personal needs, was able to prepare simple meals, and was able to go shopping. (Tr. at 19.) Most notably, Claimant testified that during the days she cared for her children, whose ages ranged from 11 months to 16 years old. (Tr. at 40, 42.) Claimant reported to Ms. Bell that she took classes in an effort to obtain her GED, but never took the test. (Tr. at 634.) Though Claimant alleges that she required assistance from her husband and others in answering questions directed toward her SSI application, there is no evidence that any deficits in adaptive functioning manifested prior to the age of 22. Accordingly, in view of the foregoing the undersigned finds that the ALJ's findings that Claimant failed to demonstrate deficits

in adaptive functioning prior to age 22, and therefore, did not meet Listing 12.05C, is supported by the substantial evidence of record.

2. <u>Severe Impairments</u>.

Claimant also alleges that the ALJ erred in failing to find that her kidney and bladder conditions were severe impairments. (Document No. 18 at 15-16.) To be deemed disabled, a claimant must have an impairment or combination of impairments which is severe, meaning that it "significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2013). Basic work activities are the abilities and aptitudes necessary to do most jobs, including: physical functions such as sitting and standing; capacities for seeing, hearing and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. <u>Id.</u>; §§ 404.1521(b)(1)-(6); 416.921(b)(1)-(6). Conversely, "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." <u>Evans v. Heckler</u>, 734 F.2d 1012, 1014 (4th Cir. 1984) (emphasis in original); <u>see also</u> SSR 85-28 (An impairment is considered not severe "when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered."); SSR 96-3p (An impairment "is considered 'not severe' if it is a slight abnormality(ies) that causes no more than minimal limitation in the individual's ability to function independently, appropriately, and effectively in an age-appropriate manner."). An inconsistency between a claimant's allegations about the severity of an impairment and the treatment sought is

probative of credibility. See Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994). As discussed above, the determination whether a claimant has a severe impairment is made at the second step of the sequential analysis.

In his decision, the ALJ found at step two of the sequential analysis that Claimant's kidney problems, bladder problems, and back pain were non-severe impairments because they were responsive to treatment and caused no more than minimal vocationally relevant limitations. (Tr. at 17.) The ALJ however, neither provided a discussion of the medical evidence relevant to Claimant's bladder and kidney problems, nor an analysis of whether her non-severe impairments resulted in any functional limitations. Contrary to the Commissioner's assertion that Claimant failed to identify any limitations resulting from these impairments, Claimant alleges and testified at the hearing, that these impairments caused severe pain and significant urgency and frequency of urination. (Tr. at 44-46.) The ALJ however, failed to acknowledge any of the medical evidence relating to these impairments, let alone summarize it or consider any resulting functional limitations. See 20 C.F.R. § 416.945. There is no analysis for this Court to review regarding Claimant's physical impairments. Accordingly, the undersigned finds that this matter must be remanded for further consideration of the severity of Claimant's kidney and bladder problems, and any resulting functional limitations.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 18.), **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 21.), **REVERSE** the final decision of the Commissioner, **REMAND** this matter pursuant to sentence four of 42 U.S.C. 405(g) for further administrative proceedings for further consideration of Claimant's impairments

22

at step three of the sequential analysis, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, Senior United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Senior Judge Faber, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: February 8, 2016.

Omar J. Aboulhosn
United States Magistrate Judge

23